**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 13-240 |
| | ) | |
| BRANDON KENNEDY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

This matter is before the Court on a Motion to Suppress, (Docket No. 22), filed by Defendant Brandon Kennedy ("Mr. Kennedy"). Upon consideration of all of the parties' submissions, the evidence of record, their arguments, and for the following reasons, Defendant's Motion to Suppress (Docket No. 22) is denied.

### II. FINDINGS OF FACT

On September 10, 2013, a federal grand jury returned an Indictment charging Defendant with committing three offenses related to the November 26, 2012 robbery of an AT&T store in Greentree, Pennsylvania. (Docket No. 1). Specifically, at Count 1, Defendant is charged with Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a). At Count 2, Defendant is charged with Using and Carrying a Firearm During and In Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). And, at Count 3, Defendant is charged with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1).[1] (*Id.*). The present motion challenges the constitutionality of a traffic stop and a subsequent search of an automobile in which Kennedy was a passenger and seizure of: bags containing electronics allegedly stolen

---

[1] Defendant had been convicted of a prior felony, Fleeing from a Police Officer in the Third Degree, in violation of Michigan Compiled Law § 257.602a(3). That case was adjudicated in the Third Judicial Circuit Court of the State of Michigan (Wayne County), at Case Number 10-013196-01-FH.

from the AT&T store; a firearm; an Ohio toll receipt; clothing worn by Brandon Kennedy; and a telephone possessed by Amanda Paige Lang ("Ms. Lang"), the driver of the vehicle, and its phone number. (Docket No. 22 at 2-3)

With that brief background, the Court turns to its findings of fact, based on the credible evidence offered at the July 30, 2013 suppression hearing.[2] The Government presented Officer David Salamas[3] ("Officer Salamas") of the South Rockwood Police Department. Defendant countered with testimony of Brittney Taylor ("Ms. Taylor"), his fiancée, and his own testimony. The Government entered into evidence three exhibits: (1) a copy of Mich. Comp. Laws Ann. § 257.628, (Docket No. 75-2); (2) the Hertz Rental Agreement for the White Chevrolet Aveo, (Docket No. 75-3);[4] and (3) the Towing and Vehicle Inventory Policy of South Rockwood, MI Police Department, (Docket No. 75-4).[5] Based on Officer Salamas' earnest demeanor and his answers to counsel's and the Court's questioning at the suppression hearing, in this Court's estimation, he offered a convincing version of the events that unfolded on the date in question. *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of*

---

[2] All citations to "Tr." refer to the transcript of the July 30, 2014 hearing, filed at Docket No. 79.

[3] Officer David Salamas has a high school diploma and a bachelor's degree from Lake Superior State University in Sault Saint Marie, Michigan in criminal justice, with a law enforcement emphasis. (Tr. at 71:19-24). He attended the police academy in the summer of 1997. (Tr. at 72:2-3). As a police officer, he completed numerous in-service law enforcement trainings, including the Michigan State Police Precision Driving School, legal updates, defensive tactics, drug interdiction training, laser and radar operator and instructor school, patrol rifle school, and tactical pistol school. (Tr. at 72:10-18). He has served in a law enforcement capacity for fifteen years, three of which were with the South Rockwood police force. (Tr. at 10:22, 11:1). At the time of the arrest in this case, he had been working on the South Rockwood force for about a year. (Tr. at 27:15-18). Prior to that, he was a police officer for the City of Romulus, Michigan for seven years, and then he was a police officer for the CN Railroad for about six or seven years. (Tr. at 27:20-24). He served in the Michigan Air National Guard in 1994, before receiving an honorable discharge. (Tr. at 72:25-73:1).

[4] The Court notes that Defendant initially objected to the introduction of same into evidence. However, after the Government asked follow-up questions to establish its foundation, the exhibit was entered into evidence with no further objection. (Tr. at 19:3-22:9).

[5] At the April 23, 2014 hearing on Defendant's Motion to Dismiss Indictment, he entered three exhibits into evidence: (1) the Green Tree Police Department record, the Department of Justice ("DOJ") follow up interview of Officer David Salamas, the DOJ Report of Investigation, prepared by James J. Fidler, and the DOJ Interview of South Rockwood Police (Michigan) Department Officer David Salamas," (Docket No. 56-2); (2) Westland Detective Bureau documents, (Docket No. 56-3); and (3) a two-page chart with descriptions of robberies of AT&T stores, (Docket No. 56-4).

*Bessemer*, 470 U.S. 564, 574 (1985)) ("'[w]hen findings are based on determinations regarding the credibility of witnesses . . . for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'"). To the extent that Mr. Kennedy's and Ms. Taylor's testimony contradicted Officer Salamas', the Court finds the officer's testimony to be more credible.

On November 5, 2012, Ms. Taylor[6] picked up a Chevrolet Aveo with Tennessee License Plate Number A57932E ("the Aveo") from Hertz Rental Car. (Tr. at 89:20-23); (July 30, 2014 Gov't Ex. 2); (Docket No. 75-3 at 2). She dealt with Hertz in person. (July 30, 2014 Gov't Ex. 2); (Docket No. 75-3). She provided her contact information, including her address. (July 30, 2014 Gov't Ex. 2); (Docket No. 75-3 at 3). She did not inform Hertz that anyone else would be using her vehicle and was the only listed authorized driver. (Tr. at 90:4-6); (July 30, 2014 Gov't Ex. 2); (Docket No. 75-3). She rented the Aveo in her name only and paid for it with her credit card. (Tr. at 89:8-20). Her live-in boyfriend, Mr. Kennedy,[7] did not ask her to rent the Aveo for him, nor did he drive it. (Tr. at 87:1-8, 137:13-14). However, Ms. Taylor testified that Mr. Kennedy helped pay for the car when "it was tooken." (Tr. at 87:12-15). Despite this testimony that Mr. Kennedy reimbursed her for the expenses related to the car's impoundment, which the Court discusses, *infra*, Mr. Kennedy did not offer any evidence that he directly paid Hertz for the Aveo or that he reimbursed Ms. Taylor.

On November 26, 2012, Mr. Kennedy needed to go somewhere,[8] but he did not have a valid driver's license. (Tr. at 88:6-8, 92:15-18). That day, Ms. Taylor permitted Ms. Lang, her

---

[6] Ms. Taylor has a GED and a certificate in culinary arts. (Tr. at 97:16-98:1). At the time of the July 30, 2014 hearing, she was employed full-time at a group home. (Tr. at 98:2-6). In November 2012, she was doing temporary work through the Staff Line agency in Redford or Livonia, Michigan. (Tr. at 98:7-20).

[7] Mr. Kennedy completed high school and then worked several restaurant jobs and performed janitorial and window cleaning work. (Tr. at 146:1-11). He also worked as a dispatcher for his family's jitney business. (Tr. at 104:1-7).

[8] The parties dispute where Mr. Kennedy was on the day of November 26, 2012. As charged in the Indictment, the Government's position is that Mr. Kennedy traveled to Greentree, Pennsylvania, robbed an AT&T store, and

friend, to drive him wherever he needed to go in the Aveo. (Tr. at 91:25, 92:5-7). Ms. Taylor did not know where they went, but she knows that they left that morning, and she did not get the car back that day.[9] (Tr. at 92:18-25).

That night, Officer Salamas was in uniform and on duty in his fully-marked police vehicle. (Tr. at 10:12-13, 13:8-18). He was positioned in the area of northbound Interstate 75 and South Huron River Drive,[10] where he was conducting speed enforcement with RADAR.[11] (Tr. at 13:20-25, 14:2-4). He is familiar with this stretch of the Interstate where the speed limit is 70 miles per hour. (Tr. at 11:10-18, 12:18-13:7); (Docket No. 75-2). In addition to his own experience and training detecting speeding violations, (Tr. at 11:12-21), he is a speed measurement operator and instructor who trains other officers to operate RADAR and LIDAR.[12] (Tr. at 11:23-25, 13:1-2). These devices are approved methods in Michigan to detect speeding violations. (Tr. at 15-17).

Around 11:40 p.m., Officer Salamas observed the Aveo traveling northbound on Interstate 75. (Tr. at 13:19-21, 14:5-16). He believed it was traveling in excess of 70 miles per hour. (Tr. at 14:7-16). In fact, he used RADAR to determine that the vehicle's speed was 81 miles per hour. (Tr. at 19-21). Based on that reading, he activated his lights and initiated a traffic stop. (Tr. at 14:24-25, 34:8-9). The Aveo pulled over onto the shoulder of the highway. (Tr. at 19:23-24). Then, he ran the license plate and determined that the Aveo was a rental vehicle. (Tr.

---

returned to Michigan that day. (Docket No. 1). Mr. Kennedy contends that Ms. Lang picked him up in Monroe City, Michigan on the evening of the 26th and they were heading back to Inkster when they were pulled over by Officer Salamas. (Tr. at 109:14-22, 110:4, 129:24-130:20). He claimed that he was at his friend Chris's house (last name unknown) in Monroe, however he was unable to provide an address. (Tr. at 131:1-6, 134:21-24). Mr. Kennedy denied being in Ohio that day. (Tr. at 121:11-16). He testified that a friend took him to Monroe and he met up with friends of Amanda there. (Tr. at 130:11-17, 135:23-136:6). The Court does not find Defendant's testimony credible, as he refused to identify last names and would not provide specific locations to account for his whereabouts.
[9] Inadvertently, Ms. Taylor's cell phone was left in the car. (Tr. at 93:1-3).
[10] Interstate 75 goes through South Rockwood, Michigan. (Tr. at 11:12).
[11] Officer Salamas defined RADAR as a device that detects speed with radio detection and ranging. (Tr. at 12:13-14).
[12] Officer Salamas explained that LIDAR is light detection and ranging. (Tr. at 12:14).

4

at 17:17-23, 36:7-10). The Court notes that, at this point, Officer Salamas was unaware of the robbery of the AT&T store in the Pittsburgh area. (Tr. at 24:5-7).

Officer Salamas exited his police cruiser and approached the driver's side of the Aveo. (Tr. at 15:4-9, 33:19-24). He observed two individuals in the vehicle: the driver, Ms. Lang, and Mr. Kennedy, the passenger. (Tr. at 15:10-19). Mr. Kennedy was unable to produce a valid form of identification, but provided Officer Salamas with his correct name and date of birth. (Tr. at 63:18-64:6). He then informed Officer Salamas that his girlfriend, Ms. Taylor, rented the vehicle, but that Ms. Lang was not his girlfriend. (Tr. at 18:3, 18:14-15, 111:20-21). Neither Ms. Lang nor Mr. Kennedy could provide a rental agreement for the vehicle. (Tr. at 18:16-18).

Standing at the driver's side, Officer Salamas smelled the odor of marijuana emanating from the driver's window. (Tr. at 16:3-4). Based on his experience and training, he ascertained that it was burnt marijuana, not fresh marijuana. (Tr. at 15:22-23, 16:7-11). The smell became stronger as he approached. (Tr. at 16:14-17). Officer Salamas found that Ms. Lang had bloodshot, glassy eyes, and her speech was a little slurred. (Tr. at 16:20-21). She informed him that, approximately two and a half hours earlier, she smoked half a blunt.[13] (Tr. at 16:25-17:2). Smoking and possessing marijuana and driving while under the influence of same are illegal in Michigan. (Tr. at 17:13-15); Mich. Comp. Laws Ann. § 257.625 (West); Mich. Comp. Laws Ann. § 333.7212 (West). Accordingly, Officer Salamas ordered Ms. Lang to be removed from the car so that he could conduct field sobriety tests, for which he is trained. (Tr. at 43:20-24). She failed those tests and was arrested for operating a vehicle under the influence of narcotics. (Tr. at 22:14-16, 43:14-20, 43:25-44:1). Ms. Lang was next patted down, handcuffed, taken into custody, told she was under arrest, and placed in the officer's vehicle. (Tr. at 44:2-15). No contraband or marijuana was found on her person. (Tr. at 24:8-10).

---

[13] A blunt is a hollowed-out cigar with marijuana inside. (Tr. at 17:3-5).

Meanwhile, Mr. Kennedy remained in the Aveo. (Tr. at 45:3-4). While Officer Salamas was conducting the traffic stop, a border patrol car arrived to assist him and provide officer safety, since the Aveo was stopped around midnight on a dark stretch of the highway with multiple occupants. (Tr. at 43:4-10). Despite the involvement of the border patrol officer, Officer Salamas had all of the interactions with Mr. Kennedy and Ms. Lang. (Tr. at 43:11-13).

After securing Ms. Lang in his vehicle, Officer Salamas proceeded to determine if either Ms. Lang or Mr. Kennedy had any outstanding warrants.[14] (Tr. at 44:20-45:2). He learned that Mr. Kennedy had three warrants. (Tr. at 36:11-37:7). One warrant was from Westland, and it had a "50-mile pickup," which means that within a 50-mile radius of the police department, that department will "pick up" the individual.[15] (Tr. at 37:8-17). (Westland, MI is approximately 27 miles away from South Rockwood.). At 12:13 a.m., Officer Salamas was advised that Westland wanted to pick up Mr. Kennedy. (Tr. at 41:25-42:10). As a result, Mr. Kennedy was arrested, searched, and patted down.[16] (Tr. at 22:17-20, 24:8-10). He was then placed in the border patrol vehicle. (Tr. at 46:10-13).

With Mr. Kennedy and Ms. Lang secured in police vehicles, Officer Salamas searched the passenger compartment of the Aveo for evidence of controlled substances, but he did not find any contraband there. (Tr. at 46:16-47:16). A second border patrol agent arrived. (Tr. at 48:3-5).[17] This patrol agent was a K9 officer, and Officer Salamas testified that his dog was a "drug

---

[14] Officer Salamas initially testified that Mr. Kennedy was still seated in the Aveo until after the warrants were confirmed, which was after 12:14 a.m. (Tr. at 45:3-11). After testifying that he was confused by the questioning, Officer Salamas clarified that Mr. Kennedy was patted down, handcuffed, and placed in a border patrol vehicle, which had arrived to provide back-up with assistance, prior to midnight. (Tr. at 23:23-24:4, 45:17-46:2).

[15] Inkster, Michigan also had a warrant for Mr. Kennedy, and Officer Salamas testified that he thought that Inkster had a 25-mile pick up, but he was unsure of same. (Tr. at 38:3-8). Detroit had a warrant for Mr. Kennedy's traffic offenses, but Officer Salamas advised that Detroit officers will not "pick up" on their warrants unless the wanted individual is within the City's limits. (Tr. at 38:9-18).

[16] He did not have any marijuana on his person. (Tr. at 46:3-7).

[17] The record is unclear as to whether the second border patrol agent arrived before or after Officer Salamas searched the interior of the car. (Tr. at 48:3-5).

dog." (Tr. at 48:6-12). The K9 officer's dog made a couple of passes around the vehicle (Tr. at 48:14-15). Then, the handler informed Salamas that the dog "indicated" the exterior of the vehicle for the presence of narcotics. (Tr. at 48:20-23, 66:21-67:3). Next, the dog was placed in the front and back seats of the vehicle. (Tr. at 48:17-21). This dog search did not reveal any contraband in the passenger compartment of the vehicle. (Tr. 49:10-14).

At approximately 12:00 midnight, Officer Salamas called for a tow truck over his radio. (Tr. at 41:3-11). He said that the driver of the vehicle, Ms. Lang, was being arrested for operating a vehicle under the influence of a controlled substance and that Mr. Kennedy was being taken into custody for outstanding warrants. (Tr. at 41:3-24). He conducted an inventory search pursuant to the standard procedure and routine practice that was in place at the time of the arrest, the purpose of which was to protect him, the department, and any valuables found in the vehicle. (Tr. at 25:2-11, 25:16-19). Apart from those motivations, Officer Salamas also was motivated to find evidence of a crime during the search of the vehicle, based on the smell of burnt marijuana emanating from the driver's side. (Tr. at 70:8-14). He credibly testified that he conducted the inventory search of the Aveo pursuant to his experience and training, not the written policy of the police department, which he admitted was subsequently changed. (Tr. at 26:23-27:2, 27:10-12) ("Q: So, were you searching based on your training and your experience or based on the policy? A: My training and experience."). He also credibly testified that searching bags found in a trunk would be routine in every inventory search. (Tr. at 26:5-9). To that end, Officer Salamas searched the trunk of the vehicle, where he found two blue nylon bags secured by drawstrings. (Tr. at 55:4-11). He opened the bags, which contained 12 Apple iPads, 14 Apple iPhones, 1 Samsung phone, and a blue piggy bank with $176.01 in United States currency. (Docket No. 24 at 4-5).

The Court also heard testimony on the issue of South Rockwood's Towing and Vehicle Inventory Policy in place at the time of the inventory search in this case, and a copy of same was entered into evidence without objection from Defendant. (July 30, 2014 Gov't Ex. 3); (Docket No. 75-4). Said policy had been changed to acknowledge its deviation from the law, because the written policy had stated that one of the purposes of an inventory search was to seize contraband or evidence contained within the vehicle. (Tr. at 26:20-27:4, 51:4-23). Officer Salamas testified that this specific portion of the policy was found to be in violation of the Constitution. (Tr. at 51:4-13). As a result, South Rockwood officers were provided a legal update on same. (Tr. at 76:1-10). Officer Salamas received the legal update as well as inventory search training. (Tr. at 25:20-22, 76:5-9). He noted he had performed similar inventory searches in other cases. (Tr. at 25:23-25). Following the inventory search, the Aveo was towed.

Officer Salamas outlined the reasons for having it towed as follows. He did not know to whom the vehicle belonged. (Tr. at 69:17). Hence, he needed to take it for safekeeping to make sure nothing happened to it and to protect him and the department from possible claims of loss. (Tr. at 69:14-19). Per § 26.3b of the South Rockwood Police Department Towing & Vehicle Inventory Policy, it is standard procedure to tow a vehicle from the scene on Interstate 75 if no one is present at the conclusion of the traffic stop to take the vehicle. (Tr. at 69:20-23); (July 30, 2014 Gov't Ex. 3); (Docket No. 75-4 at 2). The vehicle was parked on the highway, which is a tow-away zone if it is not removed within a specific time period. (Tr. at 52:24-53:8); *See also* Mich. Comp. Law Ann. §§ 257.252d(1)(b) and (c).[18] Further, Mr. Kennedy did not have a valid

---

[18] Mich. Comp. Law Ann. §§ 257.252d(1)(b) and (c) provide:
> (1) A police agency or a governmental agency designated by the police agency may provide for the immediate removal of a vehicle from public or private property to a place of safekeeping at the expense of the last-titled owner of the vehicle in any of the following circumstances:
> . . .
> (b) If the vehicle is parked or standing upon the highway in such a manner as to create an immediate public hazard or an obstruction of traffic.

driver's license at the time of the arrest, so he was unable to lawfully drive the vehicle away from the scene. (Tr. at 22:21-23, 70:3-7). Likewise, Ms. Lang was unable to drive, as she was arrested for operating a vehicle under the influence of narcotics.[19] (Tr. at 22:14-16). Ms. Taylor, the vehicle's actual renter, was not present, nor was there anyone present on behalf of Mr. Kennedy or Ms. Lang who could have driven the vehicle.[20] (Tr. at 23:5-9).

### III. PROCEDURAL HISTORY

On September 10, 2013, the Government filed an Indictment charging Kennedy with one count of Interference with Commerce by Robbery for conduct occurring on November 26, 2012, in violation of 18 U.S.C. § 1951(a); one count of Using and Carrying a Firearm During and In Relation to a Crime of Violence, for conduct occurring on November 26, 2012, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and one count of Felon in Possession of a Firearm, for conduct occurring on November 26, 2012, in violation of 18 U.S.C. § 922(g)(1). On December 23, 2013, Defendant filed the instant Motion to Suppress Evidence, (Docket No. 22), to which the Government responded on December 30, 2013. (Docket No. 24).

Based upon his contention that the law of the United States Court of Appeals for the Sixth Circuit is more favorable to his Fourth Amendment challenges, Defendant moved to transfer venue to the Eastern District of Michigan. (Docket No. 28). The Government filed a Response, (Docket No. 35), to which Defendant replied, (Docket No. 37). Accordingly, a hearing was held on February 6, 2014. (Docket No. 39). The Court denied Defendant's Venue Motion but ruled that Sixth Circuit law would apply to the issue of whether Defendant had a reasonable expectation of privacy in the rented automobile. (Docket No. 41). In applying the *lex loci*

---

(c) If a vehicle is parked in a posted tow away zone.
Mich. Comp. Laws Ann. § 257.252d (West).
[19] She was ultimately prosecuted for operating under the influence of marijuana. (Tr. at 52:6-23).
[20] He did not make any effort to call Mr. Kennedy's girlfriend to get the vehicle. (Tr. at 54:20-22).

approach, the Court reasoned that police officers are held to a good faith standard, and therefore, "logic requires that their conduct be consistently held to the law as applied within their own circuits." (Docket No. 41 at 11) (citing *Davis v. United States*, — U.S. —, 131 S.Ct. 2419, 2426 (2011); *Perry v. State*, 741 A.2d 1162, 1196-99 (Md. 1999); and *United States v. Restrepo*, 890 F.Supp. 180, 191 (E.D.N.Y. 1995). Therefore, Officer Salamas' conduct in the instant action shall be evaluated in accordance with Michigan and Sixth Circuit law, to the extent that it differs from Third Circuit law.

On March 24, 2014, Defendant filed a "Motion for Notice of Appearance," (Docket No. 46), which the Court construed as a Motion to Terminate Counsel and Proceed *Pro Se*.[21] (Docket No. 52). Thomas Livingston, Esquire, Defendant's then counsel, also filed a Motion to Withdraw as Counsel for Defendant, (Docket No. 47). The Court heard the positions of counsel and the Defendant during a Hearing held on March 27, 2014. (Docket No. 51). Following same, the Court granted Defendant's Motions, (Docket Nos. 46, 47), permitted Defendant to proceed *pro se*, and appointed stand-by counsel, Brian D. Aston, Esq. (Docket No. 62).

On June 24, 2014, Defendant moved to have Mr. Aston appointed as CJA counsel. (Docket No. 61). The Court granted his Motion on June 25, 2014, (Docket Nos. 62, 63), and Mr. Aston has remained in that role to date.

A hearing on the Motion to Suppress was convened on July 30, 2014, at which time the Government and Defendant presented their evidence and deferred argument for briefing. (Docket No. 75). Following the hearing, the Court ordered preparation of the transcript and filing of the parties' Proposed Findings of Fact and Conclusions of Law and any supplemental briefing by

---

[21] Also, on March 24, 2014, Defendant filed a *pro se* Motion to Dismiss Indictment, (Docket No. 45), to which the Government responded, (Docket No. 54). Defendant filed a Reply, (Docket No. 55), and the Court held an evidentiary hearing and oral argument on same on April 23, 2014. (Docket No. 56). This Court then denied said Motion, with prejudice. (Docket No. 57).

October 1, 2014, with responses to same due by October 15, 2014. (Docket No. 77). The Government timely filed its Proposed Findings of Fact and Conclusions of Law on October 1, 2014. (Docket No. 80). Likewise, Defendant timely filed a Brief in Support of his Motion to Suppress. (Docket No. 81). No responses were filed, although they would have been due on October 15, 2014. Thus, the Court took this matter under advisement on October 16, 2014. As the instant matter has been fully heard, briefed, and argued, it is now ripe for disposition.

## IV. OVERVIEW OF THE ARGUMENTS

In his Motion, Mr. Kennedy contests the constitutionality of the traffic stop and the search and seizure of the automobile. (Docket No. 22). He maintains that he has standing to contest the search of the rental car, in which he was a passenger. (Docket No. 81). He further argues that the police lacked reasonable suspicion or probable cause to believe that either Ms. Lang or he had committed a crime. (Docket No. 22). He avers that the drug-sniffing canine failed to positively alert to the presence of narcotics after several attempts and, therefore, argues that there was no reasonable suspicion to search the vehicle without a warrant. (Docket No. 81). Defendant also contends that the police should have allowed him to make arrangements to return the vehicle to Ms. Taylor. (*Id.*). Consequently, he asserts that the following evidence must be suppressed:

- Most (though not all) of the items that were allegedly stolen from the AT&T store, including bags containing those items;
- A firearm;
- An Ohio toll road receipt;
- Clothing worn by Brandon Kennedy;
- Telephone possessed by Amanda Paige Lang and its phone number;
- Additionally, from these items of evidence the Government has also obtained telephone and cell tower records.

(*Id.* at 2–3 at ¶¶ 6, 11).

In its Response, the Government argues that the traffic stop was lawful because the vehicle was speeding. (Docket No. 24). Further, the Government raises three distinct arguments as to why the search and seizure at issue were lawful: (1) Defendant lacks standing to challenge the search because he has no reasonable expectation of privacy in the car; (2) the search was a lawful inventory search; and (3) the search was a lawful probable cause-based search. (*Id.*). The Government also contends that the search of the car was a lawful search incident to a public arrest/transport. (Docket No. 80). The Court now addresses the parties' arguments, in turn.

## V. LEGAL STANDARD

The Fourth Amendment protects people from "unreasonable searches and seizures" of their "persons, houses, papers, and effects." U.S. CONST. AMEND. IV. Said protection is triggered only if the state invades an area in which the person has a "constitutionally protected reasonable expectation of privacy." *New York v. Class*, 475 U.S. 106, 112 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). Thus, a defendant moving to suppress evidence seized in a search "bears the burden of proving not only that the search . . . was illegal, but also that he had a legitimate expectation of privacy" in the subject of the search. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). "It is settled that at a hearing on a motion to suppress, 'the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.'" *United States v. Leveto*, 343 F. Supp. 2d 434, 442 (W.D. Pa. 2004) (quotations and citations omitted). Generally, the burden of proof is initially on the defendant who seeks to suppress evidence. *United States v. Harris*, 2008 WL 3545827, *6 (W.D.Pa. Aug. 12, 2008) (citing *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995)). However, once the defendant

establishes a basis for the motion, and a colorable claim is made, the burden shifts to the Government. *Id*.

Warrantless searches are *per se* unreasonable subject only to a few specifically established and well-delineated exceptions. *Horton v. California*, 496 U.S. 128, 133, (1990). Because no warrant authorized the search here, the burden is on the Government to prove by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement. *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). One exception to the warrant requirement is the *Terry* stop. *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968). Another exception to this requirement is a lawful inventory search. *See United States v. Mundy*, 621 F.3d 283, 287 (3rd Cir. 2010) (citing cases). Further, the automobile exception authorizes searches absent a warrant. *See United States v. Salmon*, 944 F.2d 1106, 1120 (3d Cir. 1991), *abrogated on other grounds by United States v. Caraballo–Rodriguez*, 726 F.3d 418 (3d Cir. 2013) (*en banc*). However, any evidence obtained pursuant to a search that does not meet a recognized exception to the warrant requirement must be suppressed as "fruit of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

## VI. DISCUSSION

### A. Traffic Stop

#### 1. Reasonable Suspicion of a Speeding Violation

Temporary detention of individuals during an automobile stop constitutes a seizure of persons and an investigative detention under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809 (1996); *United States v. Delfin-Colina*, 464 F.3d 392, 396-97 (3d Cir. 2006); *United States v. Simpson*, 520 F.3d 531, 540 (6th Cir. 2008). Generally, *Terry* permits a police officer to conduct "a brief investigatory stop when he or she has a reasonable, articulable

suspicion that criminal activity is afoot."[22] *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). The "reasonable suspicion" standard requires that law enforcement have "at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123. "[I]n a traffic-stop setting, the first *Terry* condition–a lawful investigatory stop–is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). It is well-established that officers are permitted to pull over a car suspected of violating any applicable vehicular traffic laws. *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (citations omitted).[23] No further suspicion of criminal activity by the driver of the vehicle or the passengers therein is necessary to justify the *Terry* stop of the vehicle. *Johnson*, 555 U.S. at 327.

Defendant argues that there was no evidence to suggest that Ms. Lang was speeding, (Docket No. 81 at 15), and he demanded strict proof of same at the motion hearing.[24] (Docket No. 22 at 3, n. 1), However, as the Government contends, there was reasonable suspicion that the driver of the vehicle, Ms. Lang, had violated a traffic law, namely that she exceeded the posted speed limit in violation of Mich. Comp. Laws Ann. § 257.628 (8) (West).

In this Court's estimation, the traffic stop was sufficiently supported with credible testimony that the Aveo was speeding. *See Johnson*, 555 U.S. at 327. Observation of a traffic violation is plainly sufficient to support a traffic stop. *See Bonner*, 363 F.3d at 217 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) ("A police officer who observes a violation of state traffic laws may lawfully stop the car committing the violation.")). A trained officer like

---

[22] The parties do not dispute that Defendant has standing to challenge the constitutionality of the traffic stop.
[23] Sixth Circuit jurisprudence is to the same effect. *See United State. v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) (driver's failure to use a turn signal provides probable cause to justify a traffic stop).
[24] The Court notes that at the April 23, 2014 Motion to Dismiss Indictment, Defendant entered into evidence the Green Tree Police Department Report, (Docket No. 56-2 at 1) and the DOJ Report, (Docket No. 56-2 at 2) which both state that the vehicle was pulled over for speeding.

Salamas, with fifteen-plus years of experience and certification as a LIDAR and RADAR operator and instructor, certainly would possess the expertise to determine that a vehicle traveling 81 miles per hour on a freeway with a speed limit of 70 miles per hour had exceeded the speed limit in violation of Mich. Comp. Laws Ann. § 257.628 (8) (West). (Tr. at 10:22-23, Tr. at 12:1-8). Thus, the totality of the circumstances supports this Court's finding that Officer Salamas had reasonable suspicion to believe that the driver of the Aveo, Ms. Lang, had committed a traffic violation prior to initiating this traffic stop, which this Court rules lawful under the Fourth Amendment. *See Johnson*, 555 U.S. at 327; *see also Bonner*, 363 F.3d at 217. The Court's analysis of Defendant's Motion proceeds.

### 2. Reasonable Suspicion of Illegal Activity

Having established that the vehicle was lawfully stopped for a speeding violation, the Court now turns to whether Officer Salamas' conduct after pulling over the vehicle was lawful. Upon making a lawful traffic stop of a vehicle, police officers are granted the authority "to detain the automobile and its occupants pending an inquiry into a vehicular violation." *Johnson*, 555 U.S. at 327. The officers then "may exercise reasonable superintendence over the car and its passengers," and have the discretion to either: (1) order the driver and passengers to get out of the vehicle; or (2) remain in the vehicle while the officers investigate the violation. *Bonner*, 363 F.3d at 216 (citations omitted). In the course of a traffic stop, police "may exercise reasonable control over the car and its passengers." *United States v. Colen*, 482 F. App'x 710, 713 (3d Cir. 2012) *cert. denied*, 133 S. Ct. 388 (2012) (citing *Bonner*, 363 F.3d at 216); *see also United States v. Noble*, 762 F.3d 509, 521 (6th Cir. 2014) (". . . police officers may order drivers and passengers out of the automobile during the traffic stop without offending the Fourth Amendment.") (citing *Maryland v. Wilson*, 519 U.S. 408, 414 (1997). Moreover, the Supreme

Court has explained that this goes as far as allowing police to order the occupants out of a car and searching them even in the absence of particularized suspicion. *Mimms*, 434 U.S. at, 110–11. However, the *Terry* stop must be reasonably related in scope to the circumstances which justified the interference in the first place. *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008) (quoting *United States v. Blair*, 524 F.3d 740, 750 (6th Cir. 2008). Moreover, "[o]nce the purpose of the initial traffic stop is completed, an officer cannot further detain the vehicle or its occupants unless something happened *during the stop* to cause the officer to have a 'reasonable and articulable suspicion that criminal activity is afoot.'" *United States v. Holloway*, 2006 WL 2946788, at *4 (E.D.Mich. 2006) (quoting *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) and citing *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert denied*, 528 U.S. 1176 (2000) (emphasis in original)); *see also United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) ("Once a valid traffic stop is initiated, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." (quotation and citation omitted). The Court must apply a two-part analysis in its assessment of the post-stop search: (1) was the officer aware of specific and articulable facts which gave rise to reasonable suspicion under the totality of the circumstances, and (2) was the degree of intrusion reasonably related in scope to the situation at hand given his suspicions and the surrounding circumstances? *Davis*, 430 F.3d at 354.

Relative to the level of suspicion required for a *Terry* stop, the Third Circuit has held that it is "somewhat lower" and "can be established with information that is different in quantity or content than that required for probable cause." *United States v. Ramos,* 443 F.3d 304, 308 (3d

Cir. 2006); *see also Alabama v. White,* 496 U.S. 325, 330 (1990). Further, the United States

Court of Appeals for the Third Circuit has clarified:

> Reasonable suspicion, while not rigidly defined, may be the result of the following factors: "specialized knowledge and investigative inferences," "personal observation of suspicious behavior," "information from sources that prove to be reliable, and information from sources that-while unknown to the police-prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip."

*Brown*, 448 F.3d at 247 (citation omitted); *see also United States v. Lyons,* 687 F.3d 754, 763-64

(6th Cir. 2012) ("Pertinent circumstances include the officer's own direct observations, dispatch

information, directions from other officers, and the nature of the area and time of day during

which the suspicious activity occurred.") (citations omitted). Depending upon the totality of the

circumstances, reasonable suspicion may be the result of one or a combination of the above and

other relevant factors. *Id.* (quoting *United States v. Nelson,* 284 F.3d 472, 478 (3d Cir. 2002) and

citing *United States v. Cortez,* 449 U.S. at 411, 417-18 (1981)).

In evaluating the officer's actions, the Court must defer to the "officer's knowledge of the

nature and nuances of the type of criminal activity the officer has observed." *United States v.*

*Robertson*, 305 F.3d 164, 166 (3d Cir. 2002) (citing *Nelson,* 284 F.3d 472); *see also United*

*States v. Lindsey*, 114 F.App'x 718, 722 (6th Cir. 2004) (citing *Terry,* 392 U.S. at 27). The

Supreme Court has explained that a reviewing court must give "due weight" to factual inferences

drawn by local law enforcement officers. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002)

(citing and quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996). Accordingly, courts

often defer to personal observations and conclusions on the theory that experienced officers can

infer criminal activity from conduct that may seem innocuous to a layperson. *Arvizu,* at 273; *see*

*also Wardlow*, 528 U.S. at 124.

Although reasonable suspicion is less demanding than probable cause, the Fourth Amendment requires that an officer making a stop has some level of objective justification for that stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In evaluating whether a particular stop is justified, courts must look at the totality of the circumstances surrounding the stop. *Id.* at 8 (quoting *Cortez*, 449 U.S. at 417). As the Supreme Court has explained:

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as the inquiries do not measurably extend the stop's duration. *See Muehler v. Mena*, 544 U.S. 93, 100–101 (2005). A reasonable passenger would understand that during the time a car is lawfully stopped, he or she is not free to terminate the encounter with the police and move about at will.

*Johnson*, 555 U.S. at 325.

In a situation strikingly similar to the one at hand, the Sixth Circuit has addressed this issue. *United States v. Everett*, 601 F.3d 484, 492–94 (6th Cir. 2010). In *Everett*, an officer originally pulled a vehicle over for a speeding violation. *Id.* at 486. The officer approached the vehicle and asked for the defendant's identification information, and the defendant admitted that he had a suspended license. *Id.* The officer smelled alcohol on the defendant's breath and ordered him out of the vehicle. *Id.* at 486-87. Without any particularized basis and prior to writing him a speeding ticket and checking his registration and proof of insurance, she asked him if he had anything illegal on his person in his vehicle. *Id.* at 487. Defendant confessed that he had an open beer and a gun. *Id.* He was placed under arrest, and the officer searched the vehicle. *Id.*

The Sixth Circuit found that such questioning did not render the traffic stop an unreasonable seizure under the Fourth Amendment. *Id.* at 496.

As this Court has already established, *supra*, Officer Salamas had reasonable suspicion to pull over the Aveo for a traffic violation.[25] The Court now addresses whether the continued seizure was lawful. As he approached the vehicle for his initial encounter with Mr. Kennedy and Ms. Lang, Officer Salamas smelled burnt marijuana emanating from the driver's side window.[26] (Tr. at 16:2-15). He then observed Ms. Lang's bloodshot, glassy eyes and slurred speech. (Tr. at 16:18-21). Based on his observations, he asked her if she had smoked any marijuana, to which she responded that she had smoked half a blunt approximately two and a half hours earlier. (Tr. at 16:22-17:2). As driving under the influence of marijuana is illegal in Michigan,[27] Officer Salamas proceeded to investigate for evidence of the crime of operating a vehicle while driving under the influence of a controlled substance. Specifically, he removed Ms. Lang from the Aveo to conduct field sobriety tests on her and searched the passenger compartment of the vehicle. (Tr. at 24:14-15, 43:19-22). In light of the totality of the circumstances, the Court finds his questioning about her marijuana use and subsequent investigation, including the search, to be reasonable and related in scope to the situation at hand given his suspicions of drug activity. *See* Section B, *infra*. Officer Salamas was also well within reason to require Defendant to remain in the Aveo's passenger seat as he conducted field sobriety tests on Ms. Lang and proceeded to check if either individual had outstanding warrants. The Court next addresses the search of the remainder of the vehicle.

---

[25] *See* p. 15, *supra*.
[26] The Court defers to the observations of Officer Salamas, which were supported by credible testimony. *See Avizu*, 534 U.S. at 273.
[27] Mich. Comp. Laws Ann. § 257.625 (West); Mich. Comp. Laws Ann. § 333.7212 (West).

## B.    Automobile Search

### i.    Standing to Challenge Search and Seizure

As indicated above, this Court will apply Sixth Circuit law for the purposes of determining whether Defendant has standing to assert Fourth Amendment violations concerning the searches of the vehicle and evidence seized therefrom. (Docket No. 41 at 11). To establish standing, the individual challenging the search has the burden of establishing that he had a reasonable expectation of privacy in the property searched and the item seized. *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001) (citations omitted). An individual may not object to a search merely by relying upon the fact that he is charged with possessing items that were found as a result of the search. *United States v. Salvucci*, 448 U.S. 83, 85 (1980) (". . . defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated."). Generally, the passenger in a vehicle lacks standing to challenge the stop and seizure of the car because he has no reasonable expectation of privacy in the car. *United States v. Pino*, 855 F.2d 357 (6th Cir. 1988), *cert. denied sub nom. Llera v. United States*, 110 S.Ct. 1160 (1990).[28]

Defendant argues that the Sixth Circuit has recognized an exception for passengers if the facts of the case are "truly unique" and, therefore, not governed by the general rule laid out in *Pino*. *Smith*, 263 F.3d at 586. The *Smith* case involved a rental car driver whom the court determined had presented sufficient evidence to support a finding that he was the *de facto* renter of car. *Id.* at 587. In making this finding, the court found the following to be significant: Steven Smith was a licensed driver who presented the rental agreement to Officer Fulcher. *Id.* Smith's wife was the authorized driver and had given him permission to drive the vehicle. *Id.* Finally, "and most significantly," the court noted that:

---

[28] *See also United States v. Kennedy*, 638 F.3d 159, 165 (3d Cir. 2011) (same).

[Steven Smith] personally had a business relationship with the rental company. Smith called the rental company to reserve the vehicle and was given a reservation number. He provided the company with his credit card number, and that credit card was subsequently billed for the rental of the vehicle. His wife, Tracy Smith, picked up the vehicle using the confirmation number given to Smith by the company. Smith had an intimate relationship with Tracy Smith, the authorized driver of the vehicle who gave him permission to drive it. This is not a case in which a driver was simply granted permission by the "renter" of the vehicle, because in this case Smith was the *de facto* renter of the vehicle. His relationships to the vehicle and its authorized driver were not "attenuated" as were the relationships in [cases from other circuits that came out differently]. Although Smith was not technically in privity of contract with the rental company . . . he did have a business relationship with the company. His business relationship with the rental company and his intimate relationship with his wife, the authorized driver of the vehicle, are relationships which are recognized by law and society. Based on these relationships, as well as the fact that he personally paid for the vehicle, Smith had both a subjective and an objective legitimate expectation of privacy.

*Id.* at 576–77.

Since deciding *Smith*, the Court of Appeals for the Sixth Circuit has returned to the question of standing to assert Fourth Amendment violations in contexts that are slightly different, but nevertheless shed light onto that Circuit's general approach to standing. For example, in *United States v. Davis*, the court again highlighted the point that, to establish the requisite "legitimate expectation of privacy," a defendant must have "[either] a property [or] possessory interest." *Davis*, 430 F.3d 345, 360 (6th Cir. 2005) (quoting *Pino*, 855 F.2d at 360); *see United States v. Taylor*, 496 F.Supp.2d 852, 856-57 (S.D.Ohio 2006) (finding that a driver did not have standing when he did not rent the vehicle, was not listed as an authorized driver, and did not have a significant relationship with the owner of the vehicle, *i.e.* the rental company); *see also Cooper v. State*, — So.3d —, 2014 WL 1385328, at *3 (Fla.App. 1 Dist. 2014) (distinguishing *Smith*)

("The mere fact that an unauthorized driver of a rental car obtained permission from the renter is insufficient, by itself, to create an objectively reasonable expectation of privacy.").

Even with the application of Sixth Circuit law, in this Court's estimation, Mr. Kennedy has not established standing to challenge the stop or search of the car, because he has not shown that he had a privacy interest in it. The present facts are distinguishable from the facts in *Smith* in many respects. To begin, Mr. Kennedy was a passenger, and Smith was a driver. (Tr. at 15:18-19); *Smith*, 263 F.3d at 575. In *Smith*, the driver had the rental agreement ready for the officer's review, and here neither Mr. Kennedy nor Ms. Lang could produce a valid rental agreement. *Smith*, 263 F.3d at 575; (Tr. at 18:16-18). In *Smith*, the defendant's wife picked up the vehicle and then gave the defendant permission to drive it. *Smith*, at 582. Mr. Kennedy was not listed on the rental agreement, (July 30, 2014 Gov't Ex. 2); (Docket No. 75-3), nor was he an authorized driver of the car. (Tr. at 20:1-6). Ms. Taylor would rent vehicles and permit Mr. Kennedy to be a passenger in them, so long as a licensed driver was operating the vehicle. (Tr. at 82:4-22). Relative to the Aveo, Mr. Kennedy did not ask her to rent it for him. (Tr. at 87:4-5). Rather, she testified that she rented the car for herself. (Tr. at 87:1-3). Indeed, the rental agreement and contact information only listed her name. (July 30, 2014 Gov't Ex. 2); (Docket No. 75-3).

Further, unlike Kennedy, Smith personally contacted the rental company to make the reservation for the vehicle in his own name. *Smith*, 263 F.3d at 582. Smith paid for the vehicle using his credit card, which was billed for the rental. *Id.* Mr. Kennedy had no such business relationship with Hertz. Ms. Taylor paid for the vehicle rental with a credit card in her name, made the arrangements to rent it, and picked it up. (Tr. at 89:8-23). Although, Ms. Taylor testified that he reimbursed her for car rentals, (Tr. at 87:12-19), there is no evidence that he paid

Hertz directly for this specific rental or that he reimbursed Ms. Taylor for same.[29] Mr. Kennedy did not provide Hertz with his credit card. (Tr. at 89:15-20). Likewise, Hertz did not have his contact information, (Tr. at 90:7-18), nor was it aware that anyone other than Ms. Taylor would be using the vehicle. (Tr. at 90:4-6). In sum, Mr. Kennedy did not have the requisite property or possessory interest in the vehicle. *Davis*, 430 F.3d at 360.[30]

Defendant has not presented evidence to demonstrate any extraordinary circumstances for this Court to find that he had a property or possessory interest in the car. Thus, he has not established a reasonable expectation of privacy in the Aveo under the Sixth Circuit precedent upon which he relies. The Court finds that he lacks standing to challenge the search of the vehicle. Such a finding is sufficient to deny Defendant's Motion to Suppress, (Docket No. 22). However, for completeness, the Court will continue its analysis.

## ii.    Automobile Exception

As indicated earlier, an exception to the warrant requirement of the Fourth Amendment is the automobile exception, which permits vehicle searches without a warrant if there is "probable cause to believe that the vehicle contains evidence of a crime." *Salmon*, 944 F.2d at 1123. "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects . . . . It travels public thoroughfares where both its occupants and its contents are in plain view."

---

[29] Defendant presented evidence that Ms. Taylor had permitted Ms. Lang to take cars she had rented previously without helping to pay for them, (Tr. at 101:17-19), but that Ms. Lang would replace the gas that she used. (Tr. at 147:2-12).

[30] The *Smith* court's holding was also supported by Smith's marital relationship with the renter of the vehicle. *Smith*, 263 F.3d at 582. The Court heard testimony that Mr. Kennedy and Ms. Taylor have been together for approximately ten years, (Tr. at 107:22-24), have two children together, (Tr. at 81:3-4), and were living together at the time of the stop, (137:22-138:1). On the rental agreement, Ms. Taylor listed her address as 4156 Purton Street, (July 30, 2014 Gov't Ex. 2); (Docket No. 75-3), however Defendant told the Westland Police Department that his address was 102 Tobin Building, Apt. 101. (Apr. 23, 2014 Deft. Ex. 2 at 3); (Docket No. 56-3).  Despite the *Smith* court's consideration of the defendant's marital relationship, this Court places greater weight on Mr. Kennedy's lack of a business relationship with Hertz.

*United States v. Chadwick*, 433 U.S. 1, 12 (1977) (quotation marks and citation omitted)). The probable cause inquiry "is entirely objective," *Halsey v. Pfeiffer*, 750 F.3d 273, 299 (3d Cir. 2014), and is "commonsense," "practical," and "nontechnical;" it is based on the totality of the circumstances and is judged by the standard of "reasonable and prudent men." *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983) (internal quotation marks and citations omitted). The Court evaluates "the events which occurred leading up to the . . . search, and then . . . [decides] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause." *Ornelas*, 517 U.S.at 696. As the Third Circuit[31] reiterated in *Donahue*, "at bottom, 'we deal with probabilities.'" *United States v. Donahue*, 764 F.3d 293, 301 (3d. Cir. 2014) (quoting *Gates*, 462 U.S. at 231). If there was a "fair probability that contraband or evidence of a crime" would have been found, there was probable cause for the search. *Id.* at 238. The Third Circuit has recently summarized this exception:

> The government bears the burden of establishing the applicability of the exception. *Herrold*, 962 F.2d at 1143 (3d Cir. 1992), by a preponderance of the evidence, *United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987). Although "the scope of the warrantless search authorized by [the automobile exception] is no broader and no narrower than a magistrate could legitimately authorize by warrant," *United States v. Ross*, 456 U.S. 798 (1982), the automobile exception includes two important elements specific to that exception: First, "[i]f probable cause justifies the search . . . , it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* Second, probable cause does not dissipate after the automobile is immobilized because the exception does not include an exigency component. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999).

*Donahue*, 764 F.3.d at 300.

---

[31] Defendant does not argue that the Sixth Circuit's law is any more favorable to him in this respect. In fact, the Sixth Circuit has upheld searches of a trunk when a police officer had probable cause to stop a vehicle at the time of an initial stop, finding that the entire stop and search of a defendant's trunk were constitutional under the automobile exception. *United States v. Arnold*, 442 F.App'x 207, 211 (6th Cir. 2011); *see also United States v. Crotinger*, 928 F.2d (6th Cir. 1991).

As the Third Circuit has held, "[i]t is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause. *Ramos*, 443 F.3d at 308 (citing *United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004) ("[T]he odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place.") and *United States v. Winters*, 221 F.3d 1039, 1042 (8th Cir. 2000)). To that end, the Third Circuit in *United States v. Rickus*, in upholding a search of a locked trunk following an initial investigatory stop, instructed:

> In *United States v. Ross*, 456 U.S. 798 (1982), the Supreme Court held that [i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of *every part of the vehicle* and its contents that may conceal the object of the search. 456 U.S. at 825. In *United States v. Schecter*, 717 F.2d 864 (3d Cir. 1983), *abrogated on other grounds*, we interpreted this language to mean that the police need have no more exact suspicions to search a trunk than are required to search the passenger compartment under the automobile exception, nor need they have independent reason to believe that the contraband for which they are searching is located specifically in the trunk. "If the state troopers in the case before us legally could have conducted a highway search of the auto under the automobile exception, they legally could have searched the passenger compartment and the trunk." *Id.* at 869. In this case, as the district court correctly concluded, the police were presented with ample evidence to give them probable cause to suspect that the automobile contained evidence of a crime. That being the case, and the trunk clearly being a "part of the vehicle" capable of concealing "the object of the search," *Ross*, 456 U.S. at 825, they were justified in searching the trunk.

*United States v. Rickus*, 737 F.2d 360, 367 (3d Cir. 1984) (emphasis in original).

With that framework in mind, the Court analyzes the legality of the search of the Aveo and its trunk. Defendant argues that there was no probable cause to support the search of the Aveo. (Docket No. 22 at 16). The Government avers that the search of the car, including the trunk, was reasonable, because there was probable cause that it contained contraband and/or evidence of criminal activity. (Docket No. 24 at 16).

Again, possession and driving under the influence of a controlled substance are illegal in Michigan.[32] Based on the strong odor of marijuana, (Tr. at 16:14-17), Ms. Lang's admission that she smoked a blunt two and a half hours earlier, (Tr. at 16:25-17:5), her failure of the field sobriety tests, (Tr. at 43:25-44:15), her bloodshot and glassy eyes, and slurred speech, (Tr. at 16:20-21), he had probable cause to search any area of the vehicle where evidence of her use of marijuana might be found. *Gant*, 556 U.S. at 347 (citing *Ross*, 456 U.S. at 820-821). Once the search of the passenger compartment did not reveal any evidence of contraband or marijuana, he was likewise justified in proceeding to search the trunk and in opening the bags contained therein. *See Donahue*, 764 F.3d at 300. Even though Ms. Lang arguably had "completed" the crime, *i.e.* she had already smoked the marijuana, a search for evidence of her crime is objectively reasonable. *See Donahue*, 764 F.3d at 303 ("After all, many, if not most, crimes are "completed" by the time of a lawful search during the investigation of the crime, and frequently the perpetrator has been identified before the search, but investigators nevertheless make the search to uncover evidence useful in a prosecution."). Officer Salamas provided credible testimony which supports this Court's finding that, in consideration of the totality of the circumstances, an objectively reasonable officer in his position would have probable cause to search the vehicle's interior and trunk for contraband.

Relative to the dog search, Defendant argues that the canine did not give a positive alert, because Officer Salamas' report states that the search was negative. (Docket No. 81 at 5). Yet, Officer Salamas credibly testified that the dog positively alerted to the outside of the vehicle. (Tr. at 49:15-19). To the extent the Government relies on the search by the dog to support the search of the trunk, the Court considers such reliance to be unnecessary. Based on the reasons set forth

---

[32] Mich. Comp. Laws Ann. § 257.625 (West); Mich. Comp. Laws Ann. § 333.7212 (West).

above, the Court finds that Officer Salamas had the requisite probable cause to search the trunk, without more.

Finding that the search of the vehicle and trunk was objectively reasonable, the Court now addresses Defendant's argument that the inventory search was illegal.

### iii.    Inventory Search

Another exception to the Fourth Amendment's protection against warrantless searches is an inventory search conducted for purposes other than an investigation. *Mundy*, 621 F.3d at 287 (citations omitted). The Supreme Court of the United States held that inventory searches pursuant to standardized police procedures are reasonable and require no warrant or probable cause. *Colorado v. Bertine*, 479 U.S. 367, 371-72 (1987). When a vehicle is in lawful police custody, it may be searched by the government for the purposes of cataloging and safeguarding the vehicle's contents. *Id.* at 373. However, as noted in *Wren v. United States*, 517 U.S. at 811, an inventory search should not be made in bad faith or for general investigatory purposes, absent the probable cause necessary to otherwise conduct a vehicle search. *See also Florida v. Wells*, 495 U.S. 1, 4 (1990); *Bertine*, 479 U.S. at 372.[33]

The standard procedure for conducting an inventory search should limit the government actor's discretion by providing when the inventory search may be conducted and what may be considered within the scope of the inventory search. *Salmon*, 944 F.2d at 1120. Additionally, impounding a vehicle is not improper as long as it is not done in order to investigate criminal activity. *United States v. Smith*, 522 F.3d 305, 311 (3d Cir. 2008) (citing *Bertine*, 479 U.S. at 375–76). The government's power to remove vehicles from public thoroughfares is "beyond challenge." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). The Third Circuit has held

---

[33] This Court has addressed the question of lawful inventory searches in the civil context in *Jackson v. City of Pittsburgh*, 688 F.Supp.2d 379 (W.D.Pa. 2010).

that a decision to impound a vehicle, even when contrary to a standard procedure, is not a *per se* violation of the Fourth Amendment, and removing vehicles that impede traffic is reasonable. *Smith*, 522 F.3d at 312–13 (citing *United States v. Coccia*, 446 F.3d 233, 238 (1st Cir. 2006)).

In *United States v. Mundy*, the Third Circuit explained:

> Lawful inventory searches must be "conducted according to standardized criteria" or established routine, consistent with the purpose of a non-investigative search. *Bertrine*, 479 U.S. at 374 n. 6. This requirement "tend[s] to ensure that the intrusion w[ill] be limited in scope to the extent necessary to carry out the caretaking function." *Opperman*, 428 U.S. at 375. The criteria or routine must limit an officer's discretion in two ways: first, as to whether to search the vehicle, and second, as to the scope of an inventory search. *Salmon*, 944 F.2d at 1120-21 (citing *Wells*, 495 U.S. at 4-5; *Bertine*, 479 U.S. at 374 & n. 6, 375-76. These limitations ensure that officers performing these caretaking functions are "'not allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of a crime.'" *Id.* at 1120 (quoting *Wells*, 495 U.S. at 4 (quotation marks omitted)); *see also Wells*, 495 U.S. at 4 ("[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.").

*Mundy*, 621 F.3d 283, 287-88 (3d Cir. 2010). The Third Circuit followed the reasoning of the United States Court of Appeals for the Second Circuit in *United States v. Lopez*, wherein it noted:

> [T]he Supreme Court has not required an absence of expectation of finding criminal evidence as a prerequisite to a lawful inventory search. When officers, following standardized inventory procedures, seize, impound, and search a car in circumstances that suggest a probability of discovering criminal evidence, the officers will inevitably be motivated in part by criminal investigative objectives. Such motivation, however, cannot reasonably disqualify an inventory search that is performed under standardized procedures for legitimate custodial purposes.

*Lopez*, 547 F.3d at 372 (citing *Opperman*, 428 U.S. at 369 and *Bertine*, 479 U.S. at 372).

Likewise, the Sixth Circuit reached the same conclusion in a case with similar facts. In *United States v. Hockenberry*, the court found that officers had probable cause to stop a vehicle. 730 F.3d 645, 660 (6th Cir. 2013). The driver of said vehicle had a suspended license, and the owner, a passenger, and also did not have a valid license. *Id.* The third individual in the car had outstanding warrants for her arrest. *Id.* Based on same, the officers towed the vehicle. *Id.* The court reasoned that the said decision was lawful, despite the driver's and passengers' requests that they make alternative arrangements to secure the vehicle. *Id.*

The court then addressed the legality of the inventory search. *Id.* The defendants argued that the officers conducted this search to further their investigation of criminal activity, not to inventory the vehicle's contents. *Id.* at 657. They also asserted that the officers' conduct varied from the department's policy, because one of the officers omitted many items from his inventory list. *Id.* at 657, 660. One of the officers testimony "demonstrated a less than ideal understanding of the purposes of an inventory search." *Id.* at 661. Further, he "repeatedly stated that part of the reason for the search was to identify contraband that might pertain to a crime." *Id.* Despite this testimony, the court found the search to be lawful and reasoned:

> Although officers must follow standardized procedure in conducting an inventory search, the law allows for some flexibility and practical judgment in how such searches are carried out. Consequently, as the district court recognized, the question is "not whether the policy was complied with to the T." Here, under the circumstances in this case, it is not clear that the officers were acting in bad faith or for the sole purposes of investigation.

*Id.* at 660 (internal citation to record omitted). In light of this precedent, the Court addresses the parties' arguments.

Defendant challenges the Government's position that the vehicle was lawfully towed and impounded. (Docket No. 27 at 5). He avers that the search was motivated by an investigative

purpose and, further, that the officers lacked probable cause and a search warrant. (*Id.* at 6). Moreover, he contends the officers must undertake reasonable alternatives to impoundment before they decide to take custody of the vehicle. (*Id.*). To that end, he proposes that the police should have called Ms. Taylor so that she could have retrieved the car. (*Id.* at 6–7). The Government contends that the search of the rental car occurred after the driver was arrested for driving under the influence and the sole passenger was arrested for outstanding warrants.[34] (Docket No. 24 at 15-16). As there was no one present to take control of the vehicle on their behalf and the car was parked in a public place, it submits that there was a clear need to seize and inventory the rental car to safely secure it and its contents. (*Id.* at 16). Defendant also argues that the circumstances of the traffic stop here did not require the vehicle to be towed under the Michigan Statute, Mich. Comp. Laws Ann. § 257.252d(1). (Docket No. 81 at 14).

The Court's inquiry here is whether an objectively reasonable officer would have impounded the Aveo and conducted an inventory search. Defendant argues that Officer Salamas called for a tow of the vehicle prior to establishing that there were outstanding warrants. (Docket No. 81 at 4); (Tr. at 41:40-41). However, the record clearly demonstrates that prior to that call, Ms. Lang was arrested for driving under the influence and Defendant could not lawfully move the car, because he did not have a valid driver's license. (Tr. at 22:21-23, 43:25-44:15, 70:3-7).

Moreover, the police department must have a policy in place to protect itself, among other things, against claims made by the property owners. Officer Salamas credibly testified that, despite the department's written policy, he conducted the inventory search pursuant to his experience and training, which had been updated to reflect a change in the law. (Tr. at 26:20-

---

[34] The Government also raises an argument that, even if the South Rockwood Police Department did not have a standard impoundment / inventory search procedure in place, it was still reasonable to impound and transport the vehicle pending its subsequent return to Hertz. (Docket No. 81 at 35). In support of said argument, it relies on *United States v. Matthews*, 532 Fed.App'x 211 (3d Cir. 2013). Defendant did not respond this argument. In light of same and the Court's findings as outlined herein, the Court does not reach this argument.

27:4, 27:7-12, 51:8-23). Officer Salamas also provided credible testimony that he decided to impound and inventory search the Aveo based on the need to safely secure it and its contents. (Tr. at 27:7-12). This was standard practice by the South Rockwood Police Department, even though it was not in accord with the exact written policy. (Tr. at 27:7-12). As the Sixth Circuit explained, police officers need not follow inventory search procedures "to the T." *Hockenberry*, 730 F.3d at 661. The Third Circuit, in *Mundy*, has held that valid, standardized inventory search procedures may be proven by either reference to written rules and regulations or testimony regarding standard practices. *Mundy*, 621 F.3d 290, n.5 (citing *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) (citations omitted)); *see also United States v. Como*, 53 F.3d 87, 92 (5th Cir. 1995) (upholding inventory search in the absence of a written policy, explaining that "testimony regarding reliance on standardized procedures is sufficient"). Here, Officer Salamas has provided that testimony, which the Court accepts.

With Mr. Kennedy and Ms. Lang arrested, it being around midnight, and the car being on a public highway, Officer Salamas was under no obligation to make alternative arrangements for the Aveo, as Defendant suggests. For example, he contends that the police should have contacted Ms. Taylor to retrieve the vehicle, as he requested. (Docket No. 27 at 6); (Docket No. 81 at 18); (Tr. at 124:8-14, 128:2-10). Despite his contention to the contrary, (Docket No. 81 at 18), Officer Salamas credibly testified that neither Mr. Kennedy nor Ms. Lang could produce a rental agreement indicating to whom the vehicle was rented. (Tr. at 18:16-18). Defendant cites no authority with facts akin to the present case that would support this Court's finding that Officer Salamas had a duty to make arrangements for the Aveo pursuant to Mr. Kennedy's request. In fact, the Sixth Circuit has not required a police officer to call a defendant's wife to ask her to retrieve a vehicle. *United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001). *See also*

*Hockenberry*, 730 F.3d at 658 ("[A]n impoundment decision will not be impermissible simply because alternative to impoundment might exist.").

Relative to Defendant's argument that the towing of the vehicle was unlawful pursuant to § 257.252d(1), the Court finds that Officer Salamas' testimony regarding the standard procedures of towing vehicles from Interstate 75 was credible. Specifically, he testified that it is standard procedure to tow a vehicle from the scene on Interstate 75, if no one is present at the conclusion of the traffic stop to take the vehicle. (Tr. at 69:20-23); (July 30, 2014 Gov't Ex. 3); (Docket No. 75-4 at 2). Moreover, the entire Interstate 75 is a tow away zone if it is not removed within a specific time period. (Tr. at 52:24-53:8); Mich Comp. Law. Ann. §§ 257.252d(1)(b) and (c).

Considering all of the facts and circumstances, the Court finds that impounding the Aveo and conducting an inventory search were objectively reasonable.

## V. CONCLUSION

Based on the foregoing, Kennedy's Motion to Suppress [22] is DENIED. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:    November 13,  2014

cc/ecf:   All counsel of record.